The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. Oyez, oyez, oyez. All persons having any manner or form of business before the Honorable, the United States Court of Appeals for the Fourth Circuit, are admonished to draw nigh and give their attention, for the Court is now sitting. God save the United States and this Honorable Court. You may be seated. Welcome, everyone, to Richmond and to the Fourth Circuit Court of Appeals. This morning, it's good to have you here. We have interesting cases and good lawyers. We're going to enjoy the morning. In the first case, United States v. Ritter. Ms. Vann, good to see you again. Good morning, Your Honor. May it please the Court, I'm Lindsay Vann, representing Daqua Ritter in this matter. Ritter's convictions were tainted by highly prejudicial, inadmissible evidence that was presented by the jury that could not have been cured by the judge's curative instruction. And by a juror who was biased in an undisclosed way related directly to the issues in this hate crimes trial. The District Court abuses discretion in refusing to grant a new trial, and each error individually warrants reversal for a new, fair trial before an unbiased jury for a determination of guilt based solely on admissible evidence presented in court. I'd like to start with the hearsay that was presented in court. The District Court abuses discretion in finding its curative instruction cured the prejudice of an inadmissible hearsay confession. At the trial, a witness named Coria Mallory testified that Mr. Ritter's uncle took Ritter to in the car. Why do we have to accept your characterization as a confession as opposed to a rumor for which there were lots of other mentions of it? I understand the arguments you make based on the timing, but that seems like an odd thing for us to do is to make an inference against the government in the posture that we're in. Well, the question at this point is what was the prejudice, what was the harm in what the jury heard? And the only logical inference from what the jury heard based on the context of the statement was that it was a confession. How can that be? I mean, the only logical inference, it seems like if what was meant was Ritter told me he killed Doe, that's what he would have said, not what was it? I heard Ritter killed Doe? I mean, it just isn't how normal people talk. Well, based on the context, it could only have come from Ritter. And so she knew that Peoples had gone with Ritter by himself, was in the car by himself, and that's how the jury would have heard it. She testified that Ritter came to the house, talked to Peoples. Her son wanted to go with Ritter and Peoples in the car, but that was refused, so they were in the car together for about 20 minutes. And the phone call was made while they were still on that trip. There was no testimony of Peoples interacting with anyone else or hearing it from anyone else. And so that context would have given the jury the inference that that information came from Ritter. The only person that they had heard was with Peoples at the time. Can I ask you just another question about sort of the way the statement is phrased? When we think about curative instructions and confessions, I think the idea is that a confession can be so vivid that it's just going to stick in a jury's mind no matter what the instruction. But those are cases where you're looking at a videotaped confession or where at least it's testimony that this guy told me he took a gun and he blew her brains out. It's something really vivid, and that's the concern, that it's going to leave this indelible impression. But, you know, I heard Ritter kill Doe even if, assuming the jury from context would piece together that that's something like a confession. It's just not clear to me why an instruction wouldn't take care of the problem there. Do you see what I'm saying? Yes, I understand. But I think the timing of how the jury heard this, I was sitting in the courtroom. I heard it as, oh, my goodness, she just testified that my client confessed. But Judge Leiden was sitting in the courtroom, too, right? And so, I mean, that's a little bit of the problem. I understand, obviously, know you well, totally trust your judgment on it. But the reason we sort of give a great deal of deference to the district court judge is because the district court judge was there and lacks an obligation to zealously represent any particular party, right? And so, like, Judge Leiden was there. It doesn't seem like she took it the same way you did. Well, she abused her discretion in her denial of the new trial. Were you a trial lawyer? Yes, Your Honor. I was the trial lawyer. You were in the courtroom, too. Yes, Your Honor. I was in the courtroom. She abused her discretion in denying the new trial by ignoring the context of the statement. And she attributed this to the rumor mill, which I agree was definitely discussed during the course of the trial. But that was a defense theory that over the course of this three-year investigation that resulted in Ritter's arrest, that the rumors around this small town over the course of time coalesced around Ritter. I heard Ritter did it. We heard that over and over again. But weren't there rumors from that, like, same day? I mean, it wasn't like the rumors only started three years later, right? They started the very day of the murder. Well, they didn't start – there was no testimony that they started as quickly as this. And so I think it's important to look at – But you agree with the – there was testimony they started the same – the very same day. We just don't have a timestamp on those. There was some testimony, but there is a bit of a timestamp. So the judge in her ruling cites multiple instances where she says there's evidence that rumors started that day on the Joint Appendix, page 1467. But Chief Wiggins, who was the chief investigator on this, testified that it was within hours. Delasia Green testified that she saw it on Facebook that night after it had gotten dark. But the testimony from Mallory and the government's theory is that at 4.41 p.m. Ritter is answering a call in the car with the victim. Then he immediately walks to People's House only a half a mile away and is in a rush to leave. And they leave and go in the car, and Mallory makes this call 30 minutes later. And so it's very quick. It's likely that when she drove by the crime scene, it was right after law enforcement had arrived, and it wasn't – there wasn't time for the rumors to spread. Admittedly, we thought the evidence was going to – You've been in a small town. It doesn't take too long for things to get around Allendale. It does not take too long for things to get around Allendale. But even Chief Wiggins, our theory was it was getting around so early that by the time he got to Ritter to interview him later that night, that – this was what we thought before trial – but Wiggins said by the time we got there, it was just that Ritter had a relationship with Doe. It was not thinking that he had committed the crime. Wiggins talked to people at the crime scene from the community, and they were telling him that it was a relationship. He didn't leave the crime scene later that night thinking that Ritter was the perpetrator. And so with Mallory's – But, I mean, the challenge I've got, and I'm happy for you to move on, but the challenge is, is like I understand that you might make that inference, right? But you might just as well say, you know, law enforcement's often like a step behind on the rumor mill, right? And yeah, things didn't get posted until after dark on Facebook, but rumors tend to circulate a bit before they get posted on Facebook. So none of those things seem to require me to conclude that there was no other way that this information was available absent a confession. Well, I just think that looking at Mallory's testimony, that she is saying that Ritter and Peoples are alone together for almost the entirety of the time before she makes the phone call. She said they're in the car alone together. There's no other way indicated in her testimony that he could have uncovered that evidence. What was wrong with the curative instruction? The curative instruction, there's nothing in particular wrong with it other than because – There's nothing wrong with it. Because there was a confession, it – And jurors are presumed to follow the instruction. Yes, Your Honor, but because of the prejudice of this particular statement, it overcomes that presumption. I also will say while the language of the curative instruction is fine – Did you get some input into the curative instructions or the judge did that on her own? The judge did that on her own, but then we did have some discussion with the government and the judge about what the curative instruction would be. The problem – But you don't complain about the content of the curative instruction? Not the content, but I will say the timing makes a difference here. So the statement, he said he heard Duquay killed Dime Doe happens. There's a sidebar. The judge gives the government a chance to clear it up. So there's some discussion of her grand jury testimony. Then there's cross-examination. Then there's redirect. Then we take a lunch. And then she comes back and makes the curative instruction. And so they've sat with that for a couple of hours or at least an hour and a half at that point after the lunch break. And so it was not this immediate curative instruction that we see in some of the other cases. But it was emphatic, the judge's instruction. I am instructing you to disregard that statement as evidence. You are to wipe it from your minds as if it was never said. It is not evidence. You cannot treat it as evidence. And you have taken an oath to follow my instructions. Yes, Your Honor. That was – it was emphatic, but our position – You want us to recognize the proposition that they didn't follow the instruction. Yes, because of the prejudice of this particular, this confession testimony. And this was not a harmless error given the weakness of the government's evidence, as we pointed out in our briefing. I would like to talk about the biased juror issue as well. So the jury foreperson on this case was a transgender woman who said that that wouldn't impact her decision, that she would be able to be impartial and review the case solely on the evidence at court. But her actions after the trial show that that – that she was, in fact, biased. She reached out to the Associated Press right after trial and – Is this a – were we reviewing Judge Leiden's credibility determination here? No, Your Honor. Why not? Because Judge Leiden seems to sort of ask these questions and decide she's not lying. Well, this is looking at the evidence for – I'm sorry, looking at the judge's decision for abuse of discretion. And one way in which – But we think about abuse of discretion in a couple of ways, but credibility is one of those places where, you know, you don't want to call it super abuse of discretion, but, like, we give a ton of deference to trial judges on credibility determinations. And this sort of seems like you're saying Judge Leiden should have found that this juror was lying. Well, no. I think as a Porter decision of this court citing Justice O'Connor's concurrence in Smith v. Phillips, it's difficult to uncover bias, one, because jurors may be unaware of it, two, because they may want to be hiding it. And so this court in Fitzgerald recognized that Sixth Amendment claims of juror bias can be based on additional circumstances outside of voir dire. Recognizing that a juror saying that they are not biased is not the end of the question, and you should look at their actions. So Judge Leiden failed to account for the juror's actions and didn't take into account the fact that the juror told the press, if one of us goes down, there will be another of us on the jury. She's referring to transgender women. This is showing that she is willing to use her jury service as a way of furthering her advocacy on behalf of trans women who are facing violence. She also, in the media, highlighted her own personal experiences of transgender violence, which she had not disclosed during voir dire. Later she testified that that was actually discussing general experiences. It wasn't her own personal experiences. And Judge Leiden didn't take into account the fact that those were not experiences she could have learned during the course of the trial. The trial was only looking at one particular instance of violence against transgender women, not the issue more generally. Can I ask you a question before your time's up on your sufficiency challenge?  And I'm trying to understand what the causation is required here. And the statute says because of actual or perceived gender identity. Yes, Your Honor. But then gender identity is defined as actual or perceived gender-related characteristics. So when you put those together, like what it says is that they were killed because of actual or perceived, gender-related characteristics, that seems like gibberish, just the way it's written. What do you understand that to mean in the context of what the government was required to prove? Yes, Your Honor. I'll let you answer that maybe open-ended. The government was required to prove that the crime was committed because Dime Jo appeared to be a transgender woman. So why is that? Because in that definition of gender identity and in the statute, I don't see any reference to being transgender. Well, it was charged. I mean, I agree, lots of people. I mean, the district judge said it was because of transgender. The arguments were because of transgender. I just don't see that in the statute. And maybe I guess I'm trying to understand why should I read transgender into that statute when it's not there? I mean, gender-related characteristics involve a lot of different things. And we can imagine lots of things that would fall into that, like the clothes you wear, as well as more physical attributes. But none of that's, like, about trans necessarily. Yes, Your Honor. I think where that came from and how that made it into the court's instructions was that was how it was indicted. It was indicted that it was because of Jo's transgender identity. But the indictment had to be consistent with the statute. Yes, Your Honor. I see my time has expired. I'm sure Judge King will give you, if you've got something you want to add on what you think this means. I mean, so you think the statute means because of transgender status. I think you're correct. I mean, obviously you're correct in reading the statute the way that it is written. I think because of how it was indicted, it became an issue of the transgender identity. But regardless, the point is that there wasn't evidence showing that this was because of Jo's gender identity, whether it was trans or otherwise. They relied on the messages that really show kind of ups and downs in the relationship, but no threats of violence, no specific issues with gender identity. And unless there are further questions, thank you, Your Honors. Thank you. Thank you. You've reserved some time. Mr. Goldman. Good morning. Your Honors, and may it please the Court, David Goldman representing the United States of America. Dockway Ritter is currently serving two life sentences and an additional 20 years in prison because he couldn't bear the thought of the world finding out that he was having a sexual relationship with someone who identified as a transgender woman, namely Ernest or Dime Doe. So Ritter shot Doe in the head three times, burned his own clothes, tried to get rid of the gun, lied as he concedes repeatedly to the police, and then fled the state. After hearing five days of, in the district court's words, overwhelming evidence of guilt, a jury of his peers took less than four hours to return guilty verdicts on all three counts, a bias-motivated killing, murder with a firearm in relation to a crime of violence, and obstruction of justice. This court should affirm. So my goal is to help you all do that in the most straightforward way possible. Not to hijack it, but can you start with this question of what in the world this means when it says, you know, inserting the definition of gender identity. Because of actual or perceived gender-related characteristics. Sure. I mean, start with, like, what it means to have actual or perceived twice. Like, what that possibly means. Like, I've tried to draw a chart. I can't quite figure it out. And then whether you think there's some, like, connection to transgender status that is a part of that or a necessary part of that. Help me understand what it means. Yes, Your Honor. But if I may, I'll actually start first. There are, like, four questions in there, but yes. But I'm actually going to add a first question in there, which is that whether this was briefed or raised below, it was not. So as the Supreme Court recently reiterated in Clark v. Sweeney, party presentation does matter. But I'm happy to answer the question. We have to understand what the statute means. And it may well be that the incoherence here wasn't briefed, but I'm trying to understand, like, what it means because I have to evaluate the district court's ruling that the claim was or the charge was satisfied because the victim was transgender. Yes. That's what the district court's ruling was. Yes. And if that was, like, a legal error, then, like, I don't know what to do with that. And, again, I'm not going to try to fight you on that. I'm happy to answer it. But I will also – Did you write the indictment? Excuse me? Did you write the indictment? So I have to confess, I was not in the courtroom. I am the lone person here who was not involved in the courtroom. You were not in the courtroom. No. And I didn't write the indictment either. But I didn't ask you if you were in the courtroom. I did not write the indictment. I asked if you wrote the indictment. And the indictment doesn't use the word transgender at all, right? It uses the word gender identity. Sure. But the jury instructions did. And as this court has flagged before, if the jury instructions are not challenged, we evaluate. No, no. Actually, the jury instructions don't precisely, right? Oh, and that might be my error then. But I'm happy to answer the question. So what it says – I mean, jury instructions are actually quite clear, right? It says because of actual or perceived gender identity. And then it defines gender identity means actual or perceived gender characteristics. Okay. Then that's my error. It then goes on to describe what a transgender person is.  But it gives us no reason why that's relevant. Yeah. So I'll just move on to the question then. Yeah. So the way I would read that is that when you're defining the gender identity, the actual perceived gender characteristics are in the mind of, in this case, the victim. So as Doe perceived – So this is the second use of actual or perceived? Yes, within the definition, the embedded definition.  And so Doe acts on that, and there was plenty of testimony that Doe dressed as a woman, told people essentially that that was Doe's identity. The second part of actual or perceived would be from the standpoint of the defendant because the defendant – How do I get that? I mean – Well, it's the actual or perceived fill-in-the-blank protected characteristic of the victim. And so the point is that Congress is trying to criminalize I commit a crime against Jews. Well, it turns out they're not Jews. Well, that's not a defense because that's not the harm that we're trying to do. Because that's your perception. Yes. As the defendant, the defendant's perception.  So if I'm a – I don't want to make it me. I'll make my law clerk. My law clerk's a misogynist, and so he goes and he kills someone that he believes to be a woman because they're a woman. He's guilty under this particular provision. It doesn't matter whether in actuality the victim is a woman or not as long as he perceived it that way. Yes. But that's the first set. That doesn't help me with what the repetition does. Right. Because the point is it doesn't matter whether – if he perceived the victim to be a woman and he did it because he's a misogynist, then what the victim thought about him or herself makes no difference. Well, I think that that's getting at the unique nature of what gender identity is, which is that it is in many ways revolving around one's perception of oneself. So it's hard to avoid the actual or perceived language in the definition because part of often what it's referred to is when we're referring to someone as transgender is I perceive myself as having a gender different from perhaps what my sex is. But if you're not conveying that, the defendant here is not going to know it, right? So like – because it has to be in the mind of the defendant. Because of has to be from the mind of the defendant. Yeah. So I guess what I'm trying to get at is like – let me ask a different question, and then I'll stop and let my colleagues go because I'm totally confused by this. Is there any scenario under which you could charge somebody for actual or perceived gender identity that you couldn't also charge them for actual or perceived gender, which is another provision? Yeah. These two charges seem to me to be wholly – like they are absolute matches for one another. So I don't think they're absolute matches. Give me the example that you think – Yeah. You are walking – you have a gang of people walking out at night, and they see someone of either sex dressed as the other sex, and they think, we don't like that. That's not proper. I'm going to go attack this person because I don't like the fact that you're transgender. Right, but – So maybe let me ask – I think what you're saying. So do you think Bostock doesn't apply because of the rule of lenity? Sure. That's right. That's where I figured we were going with this. I think that essentially Bostock recognized that there are some statutes where you have both traits listed, and I think that's part of the reason why Bostock is really focused on the text of Title VII itself and on that particular circumstance because it recognized that these two things are not necessarily synonymous, and you do have statutes where you're going to have them separately listed, and they do not always coincide. If I may get to the hearsay issue, which was the bulk of the argument so far this morning. Going back to that. Yeah. It's the government's position that that was a determination or an element that was required to be found by the jury. The perceived gender identity? Yes. Yeah. That you alleged willfully inflicting body injury because of the victim's actual or perceived gender identity. Yes. As required by the statute. Yes. And you alleged it in the indictment. Yes. And the jury was required to find it. Yes. Under the evidence, and that that was done. Yes. Would you like to discuss the sufficiency of that element? The question is, what in the world is Judge Richardson talking about? If I've misperceived the question, I'm happy to answer it. Have I missed the question? Pardon? I read you. Okay. Yes, I agree that that is. I've got that language out of your brief here. Yeah. And you're saying that the jury found that. Yes, absolutely. Yes. To get to the hearsay issue. So, again, yeah, so the question here, as has already been discussed, is not whether this admission was proper. The question is whether the statute applies here. Well, actually, yes. And if the statute doesn't apply, all this thing is void, right? Well, it would not be void because, again, this is the defendant has never raised an issue that this was not properly charged or not properly prosecuted. And that would be on the defendant to raise. So if I may get to the hearsay issue, there was no abuse of discretion. You would argue that to be harmless error? Well, it's not harmless. It's not a complaint of error at all. Again, I mean. Go ahead. Again, I mean, the Supreme Court recently made very clear to this specific court that we cannot be looking outside the briefing to decide issues to vacate jury convictions and convictions generally. That's not totally clear, right? So what the court says is you can't make up a new claim, right? So, like, you can't make up a new claim. What it doesn't say, they've challenged causation on the sufficiency of the evidence. Yes. Right? And so the legal predicate to that question is what is required to show causation, right? They've made that argument. To be fair, they hadn't made this particular version of it, but they've raised the claim. They've made the argument. And so I don't think it's the same as the scenario where a court is, like, making up new claims. The claim has been very specifically raised. There was not sufficient evidence to find causation. The particular citations and reasons that are given might look a little different, but it's not that they haven't raised the claim. Okay, fair enough. So I guess maybe I would analogize to a claim of plain error, which if we had assumed that he had actually briefed this on appeal, we would ask whether it's plain error. But this wouldn't satisfy the contours of plain error anyway, which usually is defined as requiring that there be on-point precedent. I'll stop here, but it's not plain error because they raised it in the district court. And what the district court said is that he did so because Doe was a transgender, right? And if that was a legal error, right, it's not plain error because it was raised, and that's what the district court found. I was just analogizing to plain error because, again, this has been waived on appeal by not being briefed. On the issue of hearsay, we are again talking about abusive discretion, and I do want to sign on to the skepticism that the only logical inference here was that this was a rumor mill. And I want to clarify some things that have been said before. So, first of all, rumors were circulating immediately after the murder. Delasia Green testified, and with all due respect, I think it was before the sun went down. And she's out in Columbia. She's not even in Allendale. There were rumors all over Facebook. And also, the phone call was after Ritter was likely dropped off because the store was 20 minutes away. The phone call was about 30 minutes afterward. The district court, as my friend noted, has ample citation to evidence about this rumor mill at trial. This was a central theme of my friend's arguments in closing as well as opening of this case. And that's simply not a central issue of the case. It's not something that would have been incredibly prejudicial. But I'm also happy to indulge, just for the sake of argument, the assumption that this was a confession. As Judge Harris noted, the reason that we often are afraid of inadmissible confessions is how specific and how vivid they are. This was quite the opposite. And really importantly, what has not been mentioned yet, is that the juror, excuse me, the witness who came on right before Mallory gave an actual explicit confession from Ritter. This was Jamie Priester. And she testified multiple times that Ritter told her the day after the murder that he had killed Doe, why he had killed Doe. And there was no question that that was a confession. It was already fresh in the juror's minds. As to the issue about a curative instruction, as Judge King mentioned, it was explicit. As my friend noted, defense approved the instruction. And as for any delay in giving the instruction, well, that's simply due to the fact that defense never actually requested the curative instruction. That was Judge Leiden who came up with it and said, I think I need to give a curative instruction. And then the defense approved it. So any delay really can't be the fault of Judge Leiden here. And then certainly that has to be presumed to be followed under Chong Lam. And beyond that, it would have been harmless because there was overwhelming evidence of guilt as the district court found. To touch briefly as well on the issue of Juror 71. So as Judge Richardson pointed out, we maybe don't use the term super abusive discretion, but we can use the term skilling deference. Under United States v. Skilling, our deference is at its pinnacle here when we are talking about jury credibility findings. Because, of course, they are based on things that we just cannot get from a cold record. And as we noted below in our briefing, Juror 71 was asked not once, not twice, but 12 times throughout the course of these proceedings whether the juror believed that the juror could be impartial during these proceedings because of the juror's gender identity or any other reason. Every single time, the juror answered, yes, I can be impartial. And on every single occasion, Judge Leiden found that the juror was credible. And there is no basis for disturbing that. And frankly, if anything, the record evidence of the juror's actions show not someone who is attempting to hijack this trial to prove a point, but quite the opposite. Juror 71 showed a real conscientiousness for the integrity of the trial and the verdict. Before trial, voluntarily approaching the bench to say, I identify as trans, and though I don't think it's going to be a problem, I will let the court decide. After trial, emailing the clerk's office to say, I have found out that a coworker of mine is related to Doe. Again, I don't think it's an issue, but I just want the court to know. If the juror had some sort of aim that the juror wanted to accomplish in this trial, these would all be really silly mistakes to make. I'm also happy to talk more about sufficiency of the evidence, if your honors have any questions. But given that that has not yet been discussed this morning, I'm happy to rest on our briefs with that. If there are no further questions, we would ask this court to affirm. Thank you very much. Thank you. Ms. Vann? Thank you. I'd like to start with the harmless error discussion, specifically about Jamie Priester's testimony prior to Ms. Mallory's testimony. Jamie Priester testified that Mr. Ritter had confessed to her son in her son's car while she was in the backseat. She was confused about which day that happened. She testified that it was the day after. Her prior statements to the police had said it was on the same day as the murder. This was incentivized testimony. She was trying to help her brother, who was facing federal charges and was in detention at the time that she first alleged that there was a confession. Her testimony about the confession is also contradicted at every turn. She talked about a video circulating or that could have circulated with Mr. Ritter and Ms. Doe in it. But SLED testified they recovered photos from Doe's phone, including deleted photos, and there was no photo. Jamie Priester's testimony about how the shots happened, saying that Ritter was outside the car and chased the car after it moved, were all contradicted by the other physical evidence that was presented at the trial. And this was all pointed out in the cross-examination of Jamie Priester, undermining the credibility of that confession. Then Mallory comes up and testifies Peoples, Ritter's uncle, heard from him that he did it. So there was no chance to undermine the credibility of that confession from Mr. Peoples because Mr. Peoples never testified at the trial. So what really happened is Mallory comes in with this unchallengeable, inadmissible confession testimony that could not be contradicted, and it props up all of this other testimony whose credibility had been undermined. This is not the type of case where there is a mountain of evidence or overwhelming evidence of guilt. There was no eyewitness or security footage. None of the forensic evidence connected Ritter to the scene. In fact, the DNA under the victim's fingernails and on the cartridge casings excluded Ritter as the contributor to that. And there was also testimony that Ritter was already downtown by the time of the alleged 441 phone call that the government relied so heavily on to say that Ritter was still in the car with Doe at the time of the murder. So really this makes it so the evidence is confused and disputed, and then Mallory comes in with this testimony that couldn't be challenged or contradicted because it was an inadmissible hearsay. And for that reason, this is not a harmless error. Didn't your own cross challenge the testimony based on the grand jury testimony? There was an attempt to do that, but it did not work. And that's another part of the abuse of discretion from the district court. She was there, right? I mean, it's really hard to tell as a lawyer. I mean, as you well know, like whether the cross lands or doesn't land, right, because it all depends on this group of people that's on the side. It's not your judgment, but what the jury thought, right? I agree, but I think the clearest indication that the cross examination didn't work is on joint appendix page 918 where Mr. Kendrick, my co-counsel, says, well, if you didn't say it during the grand jury, that's not true, right? People's never said this. And she doubles down. She said, I don't know why I didn't say it in the grand jury, but I did. That's what he said. And so she really doubles down on it during the cross examination, which limits the efficacy of the cross examination. Well, but cross examination can be effective absent, like, the witness admitting they're lying, right? I mean, that's the point of cross examination. Despite Perry Mason, most people don't admit they're lying during cross examination, but that doesn't mean it's not effective. Yes, I agree, but I think the fact that she doesn't walk it back at all, she doesn't say that people had interacted with anyone else. She doesn't give any other context. She describes what the context was when the jury would have heard this testimony in the first place, which was that Ritter and Peoples were alone together, and so that's where he got the information. Before you run out of time, can I just bring you back to the sufficiency question? And I guess I may have a different view from my colleague about whether arguments are new or not or have been raised before, but I feel like you're standing up here, and so now do you want to make an argument that if Mr. Ritter killed Doe because of her actual or perceived transgender status, that did not count as killing her because of her actual or perceived gender identity? We have briefed this. I don't want to concede that. You have briefed it? No, no, I'm sorry. We have briefed this as a sufficiency of the factual evidence claim. I certainly don't want to disagree with Judge Richardson or concede that. I'm not asking you to. You've done it before. You can do it again. No, thank you. But I would say really what the evidence focused on at trial was Doe and Ritter had some sort of relationship, but really the question is if Ritter committed this murder, what was happening in his mind at that time? There's no evidence of them even being together or what communications they were having in the car at that time. The testimony about perhaps there was a video was undermined by the fact that they never found a video. So I think it's really unclear of what was the motivation of this, and that's simply not sufficient to prove this element of the offense. I'm sorry I went over my time, Your Honor. As long as you get questions, you answer them. Thank you, Your Honor. Thank you. We appreciate your arguments. We'll take the case under advisement, and we'll come down and read counsel and proceed to the next case.
judges: Robert B. King, Pamela A. Harris, Julius N. Richardson